1

1

2          IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF VIRGINIA
3                 CHARLOTTESVILLE DIVISION

4
    ******************************************
5   CARLOS HUMBERTO CAB SIQUIC et al.,
    on behalf of themselves and others
6   similarly situated,

7                                    Plaintiffs,

8              v.

9   STAR FORESTRY, LLC et al.,

10                                   Defendants.
    ******************************************
11

12

13                    DEPOSITION

14                       OF

15                 AMY SPEARS-THOMAS

16

17

18  Date:    August 19, 2014
    Time:    8:55 o'clock a.m.
19  Place:   Bemidji, Minnesota

20

21
    REPORTER:  Lorna D. Jacobson, Notary Public
22             Registered Professional Reporter
               P. O. Box 177
23             Bemidji, Minnesota 56619
    JACOBSON REPORTING & VIDEO SERVICES * 800-974-4282
24

25

AMY SPEARS-THOMAS

## SHEET 2 PAGE 2

2

```
 2              APPEARANCES

 5      MS. ERIN TRODDEN of Legal Aid Justice Center,
 6   Attorneys at Law, 1000 Preston Avenue,
 7   Charlottesville, Virginia 22903; appearing for
 8   and on behalf of PLAINTIFFS.

10                 and

12      MR. AUSTIN K. HAMPTON of Covington & Burling,
13   LLP, Attorneys at Law, 1201 Pennsylvania Avenue,
14   NW, Washington, DC 20004-2401; appearing for and on
15   behalf of PLAINTIFFS.
```

## PAGE 3

3

```
 2                I N D E X

 4   WITNESS:                         Page Line

 6      AMY SPEARS-THOMAS

 8   EXAMINATION  BY MS. TRODDEN:       4    21

11   Deposition Exhibit 1               7    11
        Marked for Identification
13   Deposition Exhibit 2              26    4
        Marked for Identification
14   Deposition Exhibit 3              27    12
        Marked for Identification
16   Deposition Exhibit 4              53    7
        Marked for Identification
17   Deposition Exhibit 5              70    2
        Marked for Identification

21   REPORTER'S CERTIFICATE            94
```

## PAGE 4

4

```
 2              AMY SPEARS-THOMAS
 3   Of lawful age, being by me first duly examined,
 4   cautioned and solemnly sworn to testify the truth,
 5   the whole truth and nothing but the truth, deposes
 6   and says:

 8             MS. TRODDEN:  Good morning.
 9   We've met, but my name is Erin Trodden.  I'm an
10   attorney for the plaintiffs in this case.  With me
11   is my co-counsel, Austin Hampton.
12             Before we get started, I want to
13   clarify that you're not represented by an attorney
14   in this case.
15             Correct?
16             THE WITNESS:  That's correct.
17             MS. TRODDEN:  And neither is
18   Star Forestry?
19             THE WITNESS:  That's correct.

21             EXAMINATION

23      BY MS. TRODDEN:
24   Q.   Have you ever been deposed before?
25   A.   Yes.
```

## PAGE 5

5

```
 1   Q.   When was that, approximately?
 2   A.   Years ago.
 3   Q.   Okay.
 4   A.   And it was in another case from you all.
 5   Q.   Was that the Express Forestry case?
 6   A.   Yes.
 7   Q.   Have you ever testified at a trial?
 8   A.   I don't think so.
 9   Q.   Okay.  Have you ever been deposed in any
10   other cases, apart from the Express case?
11   A.   No.
12             MS. TRODDEN:  So, just to go
13   over a couple of ground rules.  You're probably
14   familiar with all of this from before.
15             You notice the court reporter is
16   taking down everything we say.  And she will
17   report my questions and your answers, so it's
18   important that you answer verbally and not nod your
19   head "Yes" or shake your head "No."
20             Similarly, it's natural in
21   conversation to anticipate what I'm going to ask
22   and maybe jump ahead of me and answer the
23   question.  It is important that you actually wait
24   for the end of the question to answer.
25             If you don't understand my
```

**SHEET 3   PAGE 6**

                                                          6
 1   question, please let me know and I'll try to ask it
 2   in a clearer way.  And if you don't ask me to
 3   reformulate them, I'm going to assume that you
 4   understood what I asked and then that's the
 5   question that you're answering.
 6                 If you don't know the answer to
 7   the questions, tell me.
 8                 If you need to take a break at
 9   any time, let me know.  That's fine.
10   Q.    (BY MS. TRODDEN)  Are you taking any
11   medication now that would impair your memory?
12   A.    No.
13   Q.    Are you -- do you have any mental or
14   psychiatric conditions that would impair your
15   memory?
16   A.    No.
17   Q.    Are you taking any medication that would
18   impair your ability to testify truthfully today?
19   A.    No.
20   Q.    Do you have any mental or psychiatric
21   conditions that would impair that ability?
22   A.    No.
23   Q.    Okay.  So, what we're doing this morning,
24   first, is the corporate deposition of
25   Star Forestry.  Obviously, a corporation can't

**PAGE 7**

                                                          7
 1   speak for itself.  People have to speak for it.
 2   So, when someone wants to depose a corporation,
 3   the corporation sends representatives.
 4                 From your presence here today, I
 5   assume and that you're the representative designee
 6   of Star Forestry.  Is that correct?
 7   A.    Yes.
 8                 MS. TRODDEN:  I have an
 9   exhibit.
10
11             (Deposition Exhibit 1 Marked for
12              Identification by the reporter.)
13
14   Q.    (BY MS. TRODDEN)  I'm showing you what's
15   been marked as Exhibit 1.  And this is the
16   Subpoena and Deposition Notice and Schedule of
17   Subjects of Inquiry that were served on you on
18   July 14th.
19                 So, if you will take a look on
20   the third page, it starts with Schedule of
21   Subjects of Inquiry.
22                 Have you looked -- did you look
23   at this when you received it?
24   A.    Yes.
25   Q.    Okay.  And so, these topics, broadly, are

**PAGE 8**

                                                          8
 1   what I'm going to ask you about today.
 2                 Are you able to answer
 3   questions about the topics listed here?
 4   A.    I don't know what the questions are yet.
 5   Q.    Broadly, are you familiar with the topics
 6   that are listed here?
 7   A.    Yes.
 8   Q.    If we get to a question where you don't
 9   know the answer, we can go into it at that point.
10                 Okay.  So, first of all, when
11   did you start working for Star Forestry?
12   A.    Star Forestry was formed three or four
13   years ago.  I'm not exactly sure of the date I
14   formed it.
15   Q.    And you have worked for it since that
16   time?
17   A.    I no longer do.
18   Q.    Okay.  When did you stop working for it?
19   A.    We went -- Star Forestry went out of
20   business this past spring.
21   Q.    Was there a particular date this past
22   spring?
23   A.    No.  It was just a matter of tying up
24   loose ends.
25   Q.    Okay.  In the time that you were working

**PAGE 9**

                                                          9
 1   for Star Forestry, did you always work in the
 2   same capacity?  Or did your job change?
 3   A.    I was owner.  So, I remained owner.
 4   Q.    Okay.  Did you do the same work as owner
 5   during that whole time that Star Forestry was in
 6   business?
 7   A.    Yes.
 8   Q.    Okay.  Where did you work before that?
 9   A.    Independent Labor Services.
10   Q.    How long did you work for them, roughly?
11   A.    I was a sublet of them.
12   Q.    When did your work with Independent Labor
13   Services begin?
14   A.    2002.
15   Q.    And did you -- did Independent stop?  Or
16   did you stop working for them when Star came into
17   being?
18   A.    Yes.
19   Q.    Okay.  And you previously worked for
20   Express Forestry, too.  Right?
21   A.    Yes.
22   Q.    Did you work for any other forestry
23   companies?
24   A.    Yes.
25   Q.    Who else?

SHEET 21   PAGE 78

**Page 78**

1  You were trying to tease out
2  whether or not it was wrong, and I can understand
3  and appreciate that.  But from my perspective,
4  things were pretty simple and straight forward.
5  They weren't complicated.  And there were ways my
6  personal life got complicated and kind of took it
7  all out of me.
8            That's pretty much where I stand
9  on all of it.
10 Q.    If you will bear with me while we go
11 through the list of things that at one point
12 existed.
13           So, as far as you know, through
14 returns of the payroll data that could still be
15 accessed if you had the password and login?
16 A.    Theoretically, I guess.
17 Q.    And you just don't have the password and
18 login?
19 A.    No.
20 Q.    The H-2B visa applications that you did,
21 where did those go?
22 A.    All of the applications were sent to the
23 relevant agencies.
24 Q.    Did you keep copies?
25 A.    Sometimes, yes.

**Page 79**

1  Q.    Where were the copies kept?
2  A.    Usually, I had a folder.
3  Q.    That would be a folder for each season?
4  A.    Yeah.
5  Q.    What did you do with the folders at the
6  end of each season?
7  A.    Lost them.
8            I'm not a very good
9  recordkeeper.  I try.  I don't try to do anything
10 bad with it, but I'm pretty lousy.
11 Q.    And do you know -- the folder for the
12 most recent season, was that also lost?
13 A.    Yes.
14 Q.    The bids that were submitted on projects,
15 would these have been something that Devin had?
16 A.    They wouldn't be something that I had.
17 Q.    Do you know where Devin kept them?
18 A.    I don't know anything about how he
19 functions.
20 Q.    Okay.  Did you ever see them?
21 A.    I never paid attention to them, if I did.
22 Q.    Okay.  The invoices of clients, would
23 this also be something that Devin maintained?
24 A.    I didn't do those.
25 Q.    Do you know where he would have kept

**Page 80**

1  them?
2  A.    No.
3  Q.    Okay.  You mentioned that you had a bank
4  account from which you withdrew sums to pay
5  payroll and also to reimburse workers for their
6  travel expenses.  Right?
7  A.    Yes.
8  Q.    The bank records from that bank account,
9  do you have those?
10 A.    No.
11 Q.    Could you get them?
12 A.    I don't think so.
13 Q.    Why not?
14 A.    How would I do that?
15 Q.    Well, it's out there as your account.
16 A.    But everything has been closed down, and I
17 don't have any affiliation with any of it.
18 Q.    Did you give a notice to the bank that
19 Star was closed?
20 A.    I believe Devin did, yeah.
21 Q.    Have you ever attempted to get that
22 information from the bank?
23 A.    No.
24 Q.    Do you have your previous records from
25 when you would have gotten monthly statements?

**Page 81**

1  A.    I don't have any records.
2  Q.    Information, money paid by clients that
3  had been billed by Star, would that have been
4  something that Devin has?
5  A.    I didn't deal with clients or invoices or
6  bids or contracts.
7  Q.    Okay.  Itineraries, did you deal with
8  those, at all?
9  A.    Only the ones that were submitted to the
10 Department of Labor.
11 Q.    Did you -- the pieces of paper on which
12 those itineraries are written that you had
13 consulted with Devin, do those still exist?
14 A.    They were sent to the Department of
15 Labor.
16 Q.    Did you keep a copy?
17 A.    No.
18 Q.    The binders that had been in the
19 vehicles, do you know where those are now?
20 A.    They would have been the ones with the
21 posters?
22 Q.    Yes.  And the disclosure information.
23 A.    No.  I wouldn't have thought about
24 keeping those.  It's just a poster.
25 Q.    But the binders contained other

AMY SPEARS-THOMAS

SHEET 22   PAGE 82

**Page 82**

1 information, didn't it?
2 A.   Just the disclosures.
3 Q.   **Did you remove them from the vehicles?**
4 A.   When I get the vehicles back, the foreman
5 usually, at the end of the year, gets rid of
6 stuff.  Had to clean it up a little.  Didn't want
7 it to look like a pig sty.
8 Q.   **Every year you create a new binder?**
9 A.   Yes.  Usually, after they're kicked
10 around on the floor for a season, it was pretty
11 much done for.
12 Q.   **Tax information, W-4s, copies of W-2s sent**
13 **to workers, do you have records of that?**
14 A.   No.
15 Q.   **Where did those records go?**
16 A.   I've lost everything.
17 Q.   **How did you lose it?**
18 A.   Well, I've moved several times.  After
19 last year's situation last August, I moved off
20 the property, off of my home and back to
21 Minneapolis.  I was here for the summer.  And
22 during that time, a lot of things were removed,
23 thrown away, inadvertently.  Our place is kind of
24 a mess, and it was an attempt to clean it up
25 because the sheriff showed up, and it was

**Page 83**

1 embarrassing.
2 Q.   **Is that cleaning up that you did?**
3 A.   A lot of it, yeah.  It wasn't something
4 that I looked through and decided to throw away.
5 Well, it was a pig sty.
6 Q.   **Before these things were lost, how were**
7 **they kept?  Were they in a box?**
8 A.   Pretty informally.
9 Q.   **If I were looking at them, what would I**
10 **be seeing?  Would I be seeing file folders?  Or a**
11 **box?  Or a pile of paper?**
12 A.   Probably, a pile of paper.
13 Q.   **Where would this pile of paper have been?**
14 A.   Usually, on the seat of my truck, or if
15 it was the past season I didn't really keep much
16 to do with the past season.  Once we wrapped it
17 up, we wrapped it up.
18 Q.   **And then you cleaned up and got rid of it**
19 **all?  Is that correct?**
20 A.   As we went.  We didn't keep much.  When
21 you moved around, you don't keep a whole lot.  You
22 keep what you need to keep, or you think you need
23 to keep.
24 Q.   **Were any records kept in the bus?**
25 A.   The bus?

**Page 84**

1 Q.   **Was there a bus that Devin used?**
2 A.   We had an RV.
3      So, no.
4 Q.   **Was that what you lived in?**
5 A.   Sometimes, yes.
6 Q.   **But records weren't kept in there?**
7 A.   No.
8 Q.   **The list of employees -- bear with me.**
9 **We're almost through this.**
10      The list of employees that you
11 had generated for the H-2B visas, did you have a
12 copy of that for each season?
13 A.   No.  Once the visas were decided on the
14 issue, it wasn't a relevant piece of paper.
15 Q.   **And there weren't copies of passports or**
16 **visas, if you had those?**
17 A.   No.
18 Q.   **No, you didn't have them?**
19 A.   No, I didn't have them.
20 Q.   **Did you ever have them?**
21 A.   Most of them, yes.
22 Q.   **Were these also removed when you were**
23 **cleaning up?**
24 A.   I'm sure some of it was.  Like I said, we
25 had a lot of garbage that was thrown away.  In my

**Page 85**

1 move from Minneapolis back and forth, I moved
2 back and forth three or four times.  And I know
3 that in a business there are certain rules to
4 abide by, but in real life, it wasn't top
5 priority.  It was not.
6 Q.   **Payroll records to the degree that you**
7 **had any record of amounts paid to workers, this**
8 **would have been on the Cloud-based system?**
9 A.   Yes.
10 Q.   **Did you ever print out any of that**
11 **information?**
12 A.   I'm sure I did.
13 Q.   **Would you have printed it out when the**
14 **DOL came to investigate or to audit?**
15 A.   Yes.
16 Q.   **Do you know what happened to those**
17 **printouts?**
18 A.   I gave them to the DOL.
19 Q.   **You didn't keep copies?**
20 A.   No.
21 Q.   **Did Star file corporate taxes?**
22 A.   I don't think I want to answer that
23 question.
24 Q.   **I'm going to need you to be more**
25 **specific.**